Brittany Weiner
IMBESI LAW P.C.
450 Seventh Avenue, Suite 1408
New York, New York 10123
(212) 736-0007
brittany@lawicm.com

Paul Napoli
NAPOLI SHKOLNIK PLLC
1301 Avenue of the Americas, Floor 10
New York, New York 10019
(212) 397-1000
pnapoli@napolilaw.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

PONDEROSA TWINS PLUS ONE, RICKY SPICER, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

iHEARTMEDIA, INC., Spotify USA, Inc., Google Inc., Apple Inc., Sony Computer Entertainment America LLC., and SoundCloud,

Defendants.

---------------------------------------------------------------X

**Civil Case No.:**

**CLASS ACTION COMPLAINT**

**JURY DEMAND**

Plaintiffs Ponderosa Twins Plus One ("Ponderosa") and Ricky Spicer ("Plaintiffs"), on their own behalves and on behalf of those similarly situated, alleges as follows:

## INTRODUCTION

1. This is an action by and on behalf of persons who, like Plaintiffs, have and continue to suffer damages as a result of iHEARTMEDIA, INC.'s, Spotify USA, Inc.', Google Inc.'s, Apple Inc.'s, Sony Computer Entertainment America LLC.'s, and SoundCloud's,

(collectively, “Defendants”) copyright infringement stemming from Defendants’ unauthorized and unlawful use of Plaintiffs’ and putative class members’ sound recordings.

2. Plaintiffs’ copyright-protected matter includes sound recordings that Plaintiffs’ initially created in February 15, 1972 (the “Pre-1972 Recordings”) within the State of New York. Plaintiffs and those similarly situated rights’ holders seek compensation from Defendants, as well as injunctive relief, for Defendants’ infringement of Plaintiff’s rights by causing and/or allowing to be published the Pre-1972 Recordings.

**PARTIES**

3. Plaintiff Ricky Spicer is a resident of Ohio.

4. Plaintiff Ponderosa Twins Plus One is a now defunct music quintet whose members include Alvin and Alfred Pelham, now deceased, and Kirk and Keith Gardner, both currently incarcerated, as well as Ricky Spicer.

5. Plaintiff brings this action individually and on behalf of those similarly situated who hold rights in Pre-1972 sound recordings.

6. The Plaintiff Class consists of all recording artists whose pe-1972 Recordings were used and are currently being used without permission, license, and compensation.

7. Defendant iHeartMedia, Inc., is a Delaware Corporation with its principal place of Business in Texas.

8. Defendant Spotify USA Inc. is a Delaware Corporation having its principal place of business at 76 9th Avenue, Suite 1110, 11th Floor, New York, NY 10011, USA.

9. Defendant Pandora is a Delaware Corporation having its principal place of business at 2101 Webster Street, Suite 1650, Oakland, CA 94612, USA.

10. Defendant Google Inc. is a Delaware Corporation having its principal place of business at 1600 Amphitheatre Pkwy, Mountain View, CA 94043.

11. Defendant Apple Inc. is a Corporation having its principal place of business at 1 Infinite Loop. Cupertino, CA 95014. 408-996-1010.

12. Defendant Sony Computer Entertainment America LLC is a Delaware Limited Liability Company, having its principal place of business in San Mateo, CA 94404.

13. Defendant SoundCloud is a foreign Corporation with its headquarters at Rheinsberger Str. 76/77, 10115 Berlin, Germany

**JURISDICTION AND VENUE**

14. This Court has original subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq.*, which commands federal jurisdiction in a class action where at least one plaintiff or one member of the class is diverse from at least one defendant, where there are at least 100 members of the proposed class, and the amount in controversy exceeds the sum or value of $5,000,000 to a reasonable probability.

15. This Court has personal jurisdiction over Defendants because they conduct business in New York. In particular, Defendants solicit and serve New York customers through their interactive websites and on-air advertising. Defendants own numerous radio stations in New York, advertise their internet and terrestrial radio services in New York, and offer their mobile device application through these stations. Each of these locations are well known and popular in this District. Defendants violate New York law to the detriments of Plaintiffs, class members, and listeners as detailed below, by publicly performing Pre-1972 Recordings in New York without permission or paying royalties.This Court also has original jurisdiction over this

action pursuant to 28 U.S.C. § 1331 because one of Plaintiff's civil claims arises under the Constitution, laws or treaties of the United States, specifically, violation of 18 U.S.C. § 1962.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims in which the Court has original jurisdiction that they form part of the same case or controversy.

17. Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred and or emanated from this District, and Defendants have caused harm to class members residing in this District..

## STATEMENT OF FACTS

### A. Ricky Spicer

18. Mr. Spicer was born on July 3rd, 1957. Mr. Spicer's biological father is Richard Spicer and his mother was Silvia Spicer.

19. Mr. Spicer biological parents separated when he was three (3) years of age.

20. Mr. Spicer had five (5) siblings at the time his parents separated.

21. After his parents' separation, Mr. Spicer's mother had sole custody of all six (6) of her children and was their primary caretaker.

22. Mr. Spicer's mother was injured in an automobile accident when he was a child, which rendered her comatose for a significant amount of time.

23. The treating physicians of Mr. Spicer's mother did not expect her to survive the injuries she sustained from the automobile accident.

24. Fortunately, Mr. Spicer's mother survived but the injuries caused her to suffer severe emotional distress throughout the remainder of her life.

25. In 1963, Mr. Spicer's mother could no longer care for her children because of the psychological injuries. She was admitted to psychiatric facility and Mr. Spicer and his five (5) siblings were forced to be cared for by relatives for several months until she was discharged

26. In 1968, Mr. Spicer's mother experienced another psychological injury rendering her unable to care for Mr. Spicer and his siblings.

27. After her injury in 1968, none of Mr. Spicer's extended family members were able to care for his siblings or him. Mr. Spicer's older brother began military service for the United States and his two (2) youngest sisters were admitted to a foster home.

28. The remaining three (3) children, who included Mr. Spicer and his brother and sister, were all admitted to a group home operated by the state of Ohio, where they lived together for nine (9) months.

29. After nine (9) months of living together, in 1969, Mr. Spicer's sister was admitted to a separate home for girls and Mr. Spicer's brother and he were admitted to a group home for boys, known as "Ohio Boys Town."

30. Mr. Spicer was twelve (12) years of age when he lived at Ohio Boys Town. During that time, he began to sing with a couple of boys that lived in his neighborhood.

31. Mr. Spicer and his friends would practice singing extensively, utilizing any available time after school and on weekends.

32. In 1969, Mr. Spicer and his friends auditioned for a talent contest at a local high school and performed exceptionally.

33. The following night, Mr. Spicer and his friends returned to the school to perform again. Because of the boys' exceptional performance on the previous night, many people attended, including individuals apparently engaged in the recording business.

34. After their performance, the group was approached by Tony Wilson. Prior to the meeting, Mr. Spicer did not know Mr. Wilson.

35. Mr. Wilson gave Mr. Spicer a business card and informed him that he wanted to record songs with another local group, at a studio operated by Mr. Wilson's boss, Chuck Brown ("Mr. Brown"), owner of Saru Records ("Saru").

**B. The Ponderosa Twins Plus One**

36. Subsequently, Chuck Brown introduced Ricky to the members of the singing group "The Ponderosa Twins." At the time, the members of the Ponderosa Twins were Alvin and Alfred Pelham and Keith and Kirk Gardner.

37. After an informal meeting, Chuck Brown convinced Ricky to record songs with The Ponderosa Twins. The boys sung well together and decided to form the singing group "The Group," Ricky being the "plus One" in the group (hereinafter "the Group").

38. The Group was initially managed by Mr. Brown under his Astroscope Record Label and had a distribution deal in place with Sylvia Robinson, owner of All Platinum Records.

39. On October 12, 1970, when Ricky was twelve (12), the Group naively signed a personal services contract and recording agreement. Though as a minor, he lacked the capacity to legally bind himself to those agreements. Instead, those executory agreements would become voidable upon reaching the age of majority.

40. The Group released 6 sided vinyl records, which were compiled and released on the Group's first studio album, "2 + 2 = 1" ("the Album). The Album included singles such as the classics "You Send Me,", "I Remember You," "Why Do Fools Fall in Love," and most notably, "Bound".

41. All of these releases received widespread acclaim, especially "Bound," and the group was quickly labeled the "next Jackson 5" for their exciting stage act, unprecedented maturity, and ability to market love and sex themes despite their youth.

42. Mr. Spicer was the lead vocalist when the group recorded "Bound". His voice is distinctly heard throughout the song, including its chorus, which contains the following words sung by Mr. Spicer:

> Bound, bound
> Bound to fall in love

43. His father and Chuck Brown signed the personal services contract and recording agreement as his purported legal guardians. However, at the time, Ricky's father was not his guardian; the State of Ohio was.

44. Throughout 1970, The Group toured for months, sometimes performing twice in a single day. Although the Group was promised payments for their performances, Mr. Brown and Saru failed to make any payments to Ricky or the other members of the Group for any performances. In 1975, the group fell apart due to the lack of royalties and no revenue from their live shows. The group never recovered.

45. Despite his youth, Ricky managed to accomplish success in the music industry, going on to release several popular songs and performing with Gladys Knight and James Brown.

46. Despite his extraordinary talent, his performances, and other accomplishments, Ricky was never fairly compensated.

47. Ricky's fellow members of The Group, Alvin and Alfred Pelham are now deceased, and Kirk and Keith Gardner are currently incarcerated.

48. Ricky still maintains a friendly relationship Kirk and Keith Gardner and the relatives of Alvin and Alfred Pelham.

49. As evidence of Kirk and Keith Gardner's trust of Ricky, both men have conveyed a power of attorney to Ricky, which enables him to fully represent the living members of the Group. Ricky is the only living member of The Group able to fully detail the group's history and protect the group's legal rights.

50. Although the Group was promised payment, Mr. Brown and Saru failed to make any payments to Mr. Spicer for his performances.

**C. "Bound" and "Bound 2"**

51. The exploitation of Ricky, the Group, and the other Plaintiffs in the Class continues to this day. For example, Defendants have broadcast the song "Bound 2," by Kanye West, which features Ricky's original recording "Bound."

52. In 2013, while listening to the radio, Mr. Spicer heard his voice in a song produced by the Defendants.

53. The song, titled, "Bound 2" contains Mr. Spicer's audio recording of him singing the chorus to "Bound."

54. That same year, Kanye West settled a lawsuit brought by Ricky against Mr. West, Rock-A-Fella Records, Universal Music Group, and Island Def Jam. The suit was premised on the unlicensed and infringing use of the sound recording "Bound," and on a violation by those defendants of Ricky's privacy rights pursuant to NYCRL § 51.[1]

**D. Defendants' Unlawful Conduct**

55. Ricky owns the copyrights inherent in the sound recording of "Bound," as well as those inherent in the remaining sound recordings featured on the Album. These rights include the

[1] http://www.rollingstone.com/music/news/kanye-west-settles-bound-2-lawsuit-with-soul-singer-20150528; http://www.billboard.com/articles/columns/the-juice/6576199/kanye-west-settles-bound-2-sample-lawsuit

use and distribution of the recording, the right to promote the recording, and the right to receive royalty payments from the use and broadcast of the recording.

56. All defendants knowingly offer the Album, and therefore sound recordings containing Mr. Spicer's voice without his consent or authorization.

57. All Defendants operate music applications with functions that operate the same way. For example, operating under the name iHeartRadio, iHeartMedia offers internet radio services in the form of customizable music "stations" that stream music to users on the internet. To create a radio station, all a user has to do is enter the name of a singer, such as The Group, and the application will create a radio station curated to match the genre of that singer or music group. Not only will the station play songs from the group, but also similar popular music from the genre. iHeartMedia also owns hundreds of traditional "terrestrial" or AM and FM radio stations and streams their broadcasts online.

58. Many of the Defendants' applications also have features that allow the user to save a given song, such as "Bound", to their own personal music library supported by cloud technology. This cloud service operates as an external, intangible storage space that is accessible to any user, anywhere on the planet, so long as they can log into their iHeart, Spotify, Soundcloud, etc., account from a smartphone, tablet, or other compatible device.

59. As do all Defendants, iHeartMedia offers its internet radio services to the public on either a non-subscription or subscription basis. Users can access iHeart Media's internet radio services on a variety of internet platforms, including computers, digital media devices, tablets, video game consoles, and smartphones.

60. A radio or music streaming service must ensure that its internet-based and traditional broadcasts of copyrighted sound recordings are authorized, and must arrange to pay

royalties before it publically performs the sound recordings. A radio or music streaming service must also arrange to pay royalties to the owner of a sound recording each time the service reproduces the sound recording for purposes of archiving it, maintaining it, and streaming it online. If the service fails to arrange and pay required royalties, the use is unauthorized and infringes the sound recording's copyright.

61. Although federal copyright law provides an automatic license and royalty rate for digital public performances of sound recordings created on or after February 15, 1972, no such automatic license exists for recordings created before that date. Instead, state law prohibits the unauthorized reproduction and performance of pre-1972 sound recordings.

62. Defendants generate revenue through subscription fees, advertising, or both. They profit by pirating the Class's Pre-1972 Recordings without permission, license, or compensation.

63. Users of Defendants' customizable stations hear advertisements at periodic intervals between tracks and may skip only six tracks per station per hour (and fifteen tracks total per day) across all stations. Skipping a track often results in advertising broadcast.

64. Defendants' numerous internet and terrestrial radio broadcasts have included, and continue to include, countless performance of Pre-1972 Recordings, all of which have been and continue to be made without any permission from or payment to the owners of the copyright in the Recordings.

65. None of the defendants have received a valid license to perform, distribute, or otherwise appropriate the intellectual property owned by Ricky Spicer and the similarly situated Plaintiffs.

66. Defendants never contracted with Ricky or the Group to use any part of the group's recording, "Bound," or any other recording featured on the Album.

67. Defendants exploit Plaintiffs' and Class Members' rights without permission and compensation.

68. The other members of the Plaintiff Class are in the same position; their works are being used without their permission and without compensation.

**E. Copyright**

69. The Copyright Act creates a federal statutory licensing scheme pursuant to which all radio companies, such as Defendants, are required to pay royalties for the public performance of sound recordings protected by the Act. See 17 U.S.C. §§ 112(e), 114(d)(2), and 114(f). These companies pay royalties to SoundExchange, a nonprofit entity established by regulation for the collection and distribution of royalty payments pursuant to the Copyright Act.

70. The Copyright Act specifically provides that Pre-1972 Recordings will not be subject to federal copyright. 17 U.S.C. § 301©. However, Pre-1972 Recordings are not without protection. The Copyright Act explicitly left the regulation of Pre-1972 Recordings to the state. Thus, New York common law protects Pre-1972 Recordings, including Ricky's recording of Bound, from being copied, distributed, or otherwise exploited without license, authorization or payment.

71. Pre-1972 sound recordings redefined popular music in America. Defendants have earned substantial revenue by creating, marketing, and selling advertisements on radio services featuring Pre-1972 Recordings owned by Plaintiffs. But despite Defendants' profiting handsomely by advertising and offering these sound recordings to the public, they unlawfully fail to arrange for permission to use the recordings or to pay compensation for their broadcasting.

72. Defendants have not licensed the Pre-1972 Recordings from their copyright owners nor have they compensated them. Thus, without obtaining authorization or rendering

compensation, Defendants have stolen these Recordings, copied them, and publicly performed them in violation of Plaintiffs' exclusive rights to perform the Recordings.

73. Moreover, Performing Rights Societies (PRS), such as ASCAP, BMI, and SESAC are often employed to police income generated by streamed sound recordings. They also issue mechanical licenses to parties wishing to publically perform sound recordings owned by someone else. In the instant matter, however, due to Plaintiff's minor incapacity at the time of contracting and creating the sound recordings in issue, a phantom party (possibly Chuck Brown) decided to circumvent the traditional manner of employing PRS. Instead, this wrongful owner and transferor of the public performance rights in the Album used back channels and private under-the-table dealings to transfer licenses that ultimately wound up in the hands of Defendants. Thus, Defendants publically perform the Album without a valid license to do so. This constitutes copyright infringement, and the royalties generated by the public performances across all of the Defendants streaming platforms should be forwarded to Plaintiff, as he is the rightful owner of the copyrights vested in the sound recordings contained in the Album.

74. Defendants' conduct violates Plaintiffs' rights under New York State common law prohibitions against misappropriation, conversion, and unjust enrichment. Plaintiffs seek, on behalf of themselves and a class of similarly situated rights holders, compensation from Defendants, as well as injunctive relief, for violations of Plaintiffs' rights, from Defendants' unauthorized and uncompensated use of the Pre-1972 Recordings.

## **CLASS ALLEGATIONS**

75. Named Plaintiff brings this action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3) on his own behalf and on behalf of the following class of plaintiffs (the "Misappropriation Class"):

> All owners of reproduction and public performance rights in Pre-1972 Recordings that have been publicly performed, copied, or otherwise exploited by Defendants, without a license or other authorization, in the marketing, sale, and provision of internet and terrestrial radio services.

76. The persons in the Misappropriation Class are so numerous that individual joinder of all members is impracticable under the circumstances. Although the precise number of such persons is unknown, the exact size of the Misappropriation Class is easily ascertainable, as each class member can be identified by using Defendants' records. Plaintiffs allege upon information and belief that there are many thousands of Misappropriation Class members.

77. Common questions of law and fact specific to the Misappropriation Class predominate over any questions affecting individual members, including:

a. Whether Defendants copy, perform, or otherwise exploit Pre-1972 Recordings in its internet or terrestrial radio services or both without authorization or permission;

b. Whether such uses are lawful;

c. Whether Defendants' conduct constitutes misappropriation;

d. Whether Defendants' conduct constitutes unfair competition;

e. Whether class members have been damaged by Defendant's" conduct, and the amount of such damages;

f. Whether punitive damages are appropriate and the amount of such damages;

g. Whether an Order enjoining future unauthorized use of Pre-1972 Recordings in internet and terrestrial radio services is appropriate and on what terms;

h. Whether Defendants have been unjustly enriched

i. Whether Defendants have converted Plaintiff's' property to their own use; and

j. Whether Defendants should disgorge their unlawful profits, and the amounts of such profits.

78. The Named Class Representative's claims are typical of the Misappropriation Class's claims, as they arise out of the same course of conduct and the same legal theories as the rest of the Misappropriation Class, and Plaintiffs challenge the practices and course of conduct engaged in by Defendants with respect to the Misappropriation Class as a whole.

79. Excluded from the class are Defendants, their employees, co-conspirators, officers, directors, legal representatives, heirs successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; and the judicial officers and associated court staff assigned to this case.

80. Plaintiffs will fairly and adequately represent the interests of the class. They will vigorously pursue the claims and have no antagonistic conflict. Plaintiffs have retained counsel who are able and experience class action litigators and are familiar with representing plaintiffs in large scale claims.

81. Defendants have acted or refused to act on grounds that apply generally to the class, and final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. A class is also appropriate because Defendants have acted and refused to act in a manner that, upon information and belief, generally apply to thousands of individuals, thereby making injunctive relief appropriate for the class as a whole.

82. Questions of law or fact common to class members predominate over any questions affecting only individual members. Resolution of this action on a class wide basis is superior to other available methods and is a fair and efficient adjudication of the controversy because in the context of this litigation, most individual class members cannot commit large

financial resources to prosecute lawsuits against Defendants. Further, separate actions by individuals would create a risk of inconsistent or varying judgments, which would establish incompatible standards of conduct for Defendants and substantially impede or impair the ability of class members to pursue their claims. It is not anticipated that there would be difficulties in managing this case as a class action.

83. Plaintiffs reserve the right to amend all class allegations as appropriate, and to request any state law subclass or other subclasses if necessary, upon completion of class-related discovery and motions for class certification.

**COUNT I**
**COMMON LAW COPYRIGHT INFRINGEMENT AND UNFAIR COMPETITION**

84. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein. The Pre-1972 Recordings, when created, were the novel product of mental labor embodied in material form; Plaintiff and the Misappropriation Class thus have property rights in them as recognized by New York common law.

85. By duplicating the Pre-1972 Recordings without authorization from Plaintiffs and Class Members, and publicly performing those Recordings to their users for their own gain, Defendants misappropriated the Recordings and infringed Plaintiff's and Class Members property rights, which damaged Plaintiffs. As a result of Defendants' misappropriations of the Pre-1972 Recordings, Plaintiffs and Class Members are entitled to an Order enjoining Defendants from continuing to use those recordings without authorization and compensation, and an Order imposing a constructive trust on any money acquired by means of Defendants' misappropriations, including all gross receipts attributable to Defendants' misappropriate=ion of the Pre-1972 Recordings.

86. Defendant's' conduct, as described above, constituted a continuous and intentional pattern of misappropriation of Plaintiffs' and Class Members' property, justifying the imposition of punitive damages.

87. Defendants are high-profile, large-scale media companies that are intimately familiar with the mechanics of the music industry and the requirements of intellectual property law. By knowingly misappropriating works without their owners' permission and performing these works to millions of user of internet and terrestrial radio service, Defendants acted and continue to act maliciously and oppressively to injure Plaintiffs and Class members by depriving them of compensation for the use of the Pred-1972 Record Findings. Defendants continued misappropriation of the Pres-1972 Recordings was, at a minimum, done with wanton and willful disregard of Plaintiffs' and Class member rights in those Recordings, and the harm suffered by Plaintiff and Class Members was foreseeable to Defendants.

88. As a result of Defendants' misappropriation of the Pre-1972 Recordings, Plaintiffs and Class Members are entitled to an order enjoining Defendants from continuing to use those recordings without authorization and compensation, and to an order imposing a constructive trust on any money acquired by means of Defendants' misappropriation, including all gross receipts attributable to Defendants' misappropriation of the Pre-1972 Recordings.

89. Defendants' conduct has constituted a continuous, intentional, and systematic pattern of misappropriation of Plaintiffs' and Class Members' property, necessitating the imposition of punitive damages. Defendants are all large-scale, highly-popular media companies that are intimately familiar with the mechanics of the music industry and the intellectual property law requirements inherent therein. Through this knowing misappropriation without their owners' permission and performing these works to millions of users of internet and terrestrial radio

services, Defendants continue to act maliciously and oppressively to injure Plaintiffs and Class Members.

**COUNT II**
**UNJUST ENRICHMENT**

90. Plaintiffs incorporate by reference the allegations in the above paragraphs as if fully set forth herein.

91. At the expense of Plaintiffs and Class Members, Defendants have been and continue to be unjustly enriched as a result of the unlawful or wrongful conduct or both alleged herein. Defendants have unjustly benefitted through the sale of advertisements on their internet and terrestrial radio services that use, without authorization, the Pre-1972 Recordings, and it would be unjust for Defendants to retain that benefit without paying for it.

92. Defendants' conduct, as described above, constituted and continues to constitute a continuous and intentional pattern of misappropriation of Plaintiff's and Class Members' property, justifying the imposition of punitive damages. Defendants are high profile, large scale media companies that are intimately familiar with the mechanics of the music industry and the requirements of intellectual property law. By knowingly misappropriating works without their owners' permission and performing these works to millions of users of internet and terrestrial radio services, Defendants acted and continue to act maliciously and oppressively to injure Plaintiff and Class Members by depriving them of compensation for their Pre-1972 Recordings. Defendants' continued misappropriation of the Pre-1972 Recordings was at a minimum done with wanton and willful disregard of Plaintiffs and Class Members' rights in those Recordings, and the harm suffered by Plaintiff and Class Members was foreseeable to Defendants.

93. Defendants have violated and continue to violate Plaintiffs' rights through provision of internet and terrestrial radio services that include Pre-1972 Recordings. This practice unjustly enriches Defendants at the expense of Plaintiffs and class members.

94. Defendants must pay royalties for the use of sound recordings created *on or after* February 15, 1972, which are copyrighted under the Copyright Act of 1976 (the "Copyright Act" or the "Act"). The Act does not, however, extend federal copyright to sound recordings created before February 15, 1972, but specifically provides that states remain free to create remedies for unauthorized use of those Pre-1972 Recordings. Defendants have failed to obtain authorization and pay royalties.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed class, requests relief against Defendants as follows:

a) Certification of the action as a Class Action pursuant to the Federal Rule of Civil Procedure, and appointment of Plaintiff as Class Representative and his counsel of record as Class Counsel;

b) Actual damages, punitive damages, treble damages, and such other relief as provided by the statutes and common law cited herein;

c) Disgorgement of all profits earned by Defendants form coating, publicly performing, and otherwise exploiting Pre-1972 Recordings in internet and terrestrial radio services;

d) A constructive trust on any money acquired by means of Defendant's' conversion, including all gross receipts attributable to Defendants' conversion of the Pre-1972 Recordings;

e) Prejudgment and post judgment interest on any monetary relief;

f) Equitable relief enjoining future unauthorized use of Pre-1972 Recordings in internet and terrestrial radio services;

g) The costs of bringing this suit, including reasonable attorneys' fees and costs; and

h) All and any other relief to which Plaintiff and Class Members may be entitled at law or inequity.

February 8, 2016

Respectfully submitted,

IMBESI LAW P.C.

__/s/ Brittany Weiner________________

Brittany Weiner
450 Seventh Avenue, Suite 1408
New York, New York 10123
(212) 736-0007
brittany@icmlaw.com

*and*

NAPOLI SHKOLNIK PLLC

___/s/ _Annie E. Causey______________

Paul J. Napoli
Annie E. Causey
1301 Avenue of the Americas, 10th Floor
New York, New York 10019
(212) 397-1000
pnapoli@napolilaw.com

*Attorneys for Plaintiff and the Putative Class*